UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH ANTHONY SUTTON,

               Petitioner,                        Case No. 2:18-cv-10802

v.                                            Honorable Sean F. Cox

THOMAS MACKIE,

               Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS PETITION, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Petitioner Joseph Anthony Sutton, a state prisoner in custody of the Michigan Department of Corrections, filed an amended habeas corpus petition challenging his state convictions for second-degree murder and two firearm offenses. He alleges as grounds for relief that: (1) the state prosecutor suppressed evidence that a key witness was threatened; (2) trial counsel was ineffective for failing to notify the trial court that death threats were made against the prosecution witness to induce his trial testimony; (3) trial counsel's failure to produce expert witnesses was prejudicial; and (4) appellate counsel was ineffective for failing to raise certain issues on direct review. Having reviewed the pleadings and the state-court record, the Court concludes that Petitioner's claims do not warrant habeas relief. Accordingly, the Court will deny the amended habeas corpus petition. The Court also will not issue a certificate of appealability, but it will grant Petitioner permission to appeal this decision *in forma pauperis*.

## I.  Background

### A.  The Charges, Trial, and Sentence

Petitioner was charged with first-degree, premeditated murder, possession of a firearm during the commission of a felony ("felony firearm"), and felon in possession of a firearm.  The charges arose from the fatal shooting of Eugene Dixon, also known as "Bo," in Detroit, Michigan on January 28, 2006.   In June of 2006, a boater cruising on the Detroit River saw the body floating in the river.  The body was wrapped in a black trash bag that was secured with an electrical cord which had brake rotors attached to it.

The police provided drawings of the victim's face and body tattoos to the media, and about four months after the body was recovered from the river, Siniqua Blessitt ("Blessitt"), identified the body as her estranged husband, Eugene Dixon.  Two years later, Charmane Murphy ("Murphy") implicated Petitioner in the crime.  Petitioner was arrested, and in 2010, he was tried before a jury in Wayne County Circuit Court.  The key witnesses were Blessitt, Murphy, Juanita Richardson ("Richardson"), and Andre Christian ("Christian").

Blessitt testified that she became concerned about Dixon on January 27, 2006, when Dixon did not return to her house to pick up their children, as he had promised to do.  She knew Petitioner because Dixon had been to Petitioner's upper flat on Springle Street in Detroit.  On February 7, 2006, Blessitt called Petitioner because he was the last caller listed on Dixon's phone.  Petitioner told Blessitt that he had not seen Dixon and that he was looking for him also.

Blessitt called Petitioner again a few days later and asked him whether he had heard from Dixon.  Petitioner said, "No," and he asked Blessitt why she kept calling him

and whether she was trying to set him up with the police.  She never heard from Petitioner again.

On October 15, 2006, Blessitt heard about a missing man whose body had been found.  She recognized a tattoo on Dixon's chest during a newscast.  She went to the police department and subsequently identified the body at the morgue.

Murphy testified that she had an off-again, on-again, relationship with Petitioner.  She also testified that Petitioner was her daughter's father and that she and Petitioner had lived at the house on Springle Street for a while.  One day after she moved out of the house, Petitioner came to her home and said that he had to kill Dixon over some clothes.  Petitioner then explained to Murphy that he, Dixon, and someone named Theron had agreed to split up some stolen clothes and to refrain from touching the clothes when Dixon went away.  Dixon then left the premises.

When Dixon returned to the house on Springle, he got upset because people were shopping for the clothes from Petitioner and Theron.  Petitioner cautioned Dixon not to get upset in front of the customers, but Dixon remained irritated.  After telling the customers to leave the premises, Petitioner informed Dixon that he was going downstairs to get some bags so that they could divide up the clothes.  Petitioner then acquired a gun from the neighbor downstairs.  He then went back upstairs where he shot Dixon in the back of the head.  He and Theron later wrapped Dixon in some bags, put the body in a truck, and buried him at the foot of Alter Road and Jefferson Avenue.

Murphy testified that sometime after Petitioner made those admissions to her, she and Petitioner saw Blessitt in a parking lot.  Petitioner told Murphy that if Blessitt kept pointing him out to people, he was going to get rid of her, too.

On October 30, 2008, Murphy went to the police department in Warren, Michigan, and implicated Petitioner in the crime.  A few days later, she gave a statement to the officer in charge of Petitioner's case, and at trial, she denied fabricating the things that Petitioner had told her.

Richardson was seventeen years old at Petitioner's trial.  She testified that she was Murphy's cousin and that one time when she was fifteen years old, Murphy came to her house and began talking to Petitioner on the phone.  The phone was on speaker, and Richardson overheard Petitioner say that he had killed a person and if anyone got in his way, he would have the person erased.  On October 30, 2008, Richardson went the Warren Police Department with Murphy and gave a statement much like her trial testimony.

Christian testified that he was Petitioner's cousin and that in 2008, he lived with Petitioner on Pinewood Street in Detroit.  One time when Petitioner was "high," Petitioner told Christian that a guy had owed him money, they had an altercation, he shot and killed the man, wrapped the man in a bag, and got rid of the body.

Christian stated that in 2009, he and Petitioner were incarcerated in the Wayne County Jail, and when a police officer came to see him, he provided a statement.  In exchange for his testimony at Petitioner's trial, his probation was reduced from two years to one year.

Petitioner testified in his own defense.  He claimed that Murphy's testimony about his alleged admissions was not true, and that Christian and Richardson also had testified falsely about him being involved in the shooting.  He claimed that what he had said to Murphy was mere rumors he had heard about the killing and that, according to the rumors,

4

Dixon was shot during an argument with Theron over possession of a gun.   Petitioner also testified that Murphy had mental issues, and that he had explained to her that he was not present during the shooting and had nothing to do with it.

Petitioner denied telling Murphy on one occasion that, if Blessitt kept looking at him in a certain way, he would do her just like he did Dixon.   He countered Blessitt's testimony by explaining that he had refused to provide Blessitt with information because he had outstanding warrants for failure to pay child support and that he did not want any contact with the police.

Petitioner stated that Christian was a thief and that he did not get along with him. He suggested a motive for Christian's testimony by claiming that he had given $25,000 to Christian's grandmother for her house shortly before he was arrested and that the grandmother still had the money.

On April 16, 2010, the jury found Petitioner guilty of second-degree murder, Mich. Comp. Laws § 750.317, as a lesser-included offense of first-degree murder.   The jury also found Petitioner guilty, as charged, of felony-firearm, Mich. Comp. Laws § 750.227b, and felon in possession of a firearm, Mich. Comp. Laws § 750.224f.   On May 26, 2010, the trial court sentenced Petitioner as a habitual offender to a term of eighty to one hundred twenty-five years in prison for the murder conviction, a concurrent term of two to five years for the felon-in-possession conviction, and a consecutive term of two years in prison for the felony-firearm conviction.

### B.  The Direct Appeal

In an appeal of right, Petitioner argued through counsel that (1) trial counsel's failure to present evidence that Christian was biased against Petitioner constituted

ineffective assistance; (2) the trial court erred by *sua sponte* reading a jury instruction on second-degree murder even though neither party wanted the instruction, and trial counsel's failure to object to the instruction constituted ineffective assistance; and (3) the prosecution violated his constitutional right to a fair trial by emphasizing an officer's opinion that Murphy was telling the truth, and trial counsel was ineffective for failing to object to the remark.

In a *pro se* supplemental brief, Petitioner argued that: (1) the prosecution violated his right to a fair trial by refusing to disclose information favorable to the defense; (2) trial counsel failed to present evidence that information provided by Murphy was linked to third-party sources; (3) trial counsel failed to mark and present portions of Murphy's mental health records as exhibits; and (4) trial counsel's failure to object to the prosecutor's improper closing argument was ineffective assistance.

The Michigan Court of Appeals rejected Petitioner's claims and affirmed his convictions in an unpublished, *per curiam* opinion.  *See People v. Sutton*, No. 299262, 2012 WL 3020386 (Mich. Ct. App. July 24, 2012).    Petitioner presented the same claims to the Michigan Supreme Court in an application for leave to appeal.  On November 20, 2012, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues presented to it.  *See People v. Sutton*, 493 Mich. 897; 822 N.W.2d 772 (2012).

### C.  The Initial Habeas Petition, State Collateral Review, Amended Petition, and Answer to the Amended Petition

In 2013, Petitioner filed a habeas corpus petition in which he challenged a Wayne County conviction for first-degree murder.  *See Sutton v. Mackie*, No. 2:13-cv-14789 (E.D.

Mich. Nov. 20, 2013).  At Petitioner's request, the Court stayed his case so that he could pursue additional remedies in state court.

On November 15, 2015, Petitioner filed two motions for relief from judgment in the state trial court.  One motion challenged his second-degree murder conviction, and the other motion challenged his unrelated first-degree murder conviction.  He argued in a joint brief that: (1) the prosecutor suppressed evidence of police misconduct to cover up the fact that death threats were made against Christian to force Christian to testify falsely against him; (2) trial counsel was constitutionally ineffective because she failed to notify the trial court that death threats were being used to force Christian to give false testimony; (3) trial counsel's failure to call expert witnesses in his behalf prejudiced him; and (4) appellate counsel was constitutionally ineffective because he omitted compelling issues.

The trial court's successor issued an opinion that addressed both motions.  The court denied relief, in part on procedural grounds and in part on the merits.  *See People v. Sutton*, No. 09-003565 (Wayne Cty. Cir. Ct. Feb. 18, 2016) (unpublished).

Petitioner appealed the successor court's decision without success.  The Michigan Court of Appeals denied leave to appeal because Petitioner had failed to establish that the trial court erred when it denied his motion for relief from judgment.  *See People v. Sutton*, No. 331760 (Mich. Ct. App. Aug. 4, 2016) (unpublished).  On May 2, 2017, the Michigan Supreme Court denied leave to appeal because Petitioner had failed to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Sutton*, 500 Mich. 981; 893 N.W.2d 614 (2017).

On June 12, 2017, Petitioner filed two amended habeas corpus petitions and a motion to lift the stay in his 2013 habeas case.  One of the amended petitions attacked

the second-degree murder conviction at issue in this case, and the other amended petition attacked his first-degree murder conviction.

The Court granted Petitioner's motion to lift the stay and directed the Clerk of Court to open a new case for the amended habeas petition challenging the second-degree murder conviction at issue here.  The Clerk of Court then opened this case and gave it the case number shown in the caption above.  The grounds for relief set forth in the amended petition read as follows:

I.    The prosecutor suppressed evidence of extreme police misconduct in order to conceal from the trial court the fact that death threats had been used against a jail prisoner to force false testimony against Defendant Sutton.  The prosecutor then made up false stories to the court in order to validate the prisoner's position in the proceedings as a witness against the defendant Mr. Sutton.

II.   Defense counsel was constitutionally ineffective when failing to bring to the attention of the trial court that there existed evidence that indicated that death threats were then being used to force false testimony from a jail prisoner against defendant Mr. Sutton.

III.  Defendant was denied the effective assistance of trial counsel where counsel failed to call upon expert witnesses who had been previously amended to the witness list for defendant.  This was a critical error where the trial hinged on the testimony by an expert.

IV.   Appellate counsel was constitutionally ineffective when omitting the most critical compelling issues that were clearly outstanding from the court record, and without any reasonable strategic purpose.

(Am. Pet., ECF No. 20, PageID.1846.)

The State filed an answer to the amended petition.  It urges the Court to deny the amended petition because Petitioner's claim about the prosecutor and one of his claims about trial counsel are procedurally defaulted.  The State also contends that the claims about the prosecutor and trial counsel are meritless and that Petitioner has not made a

valid claim of ineffective assistance of appellate counsel.  (Answer in Opp'n to Pet. for Writ of Habeas Corpus, ECF No. 22, PageID.1933-1934.)

A procedural default ordinarily is not a jurisdictional matter, *Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016), and a court may bypass a procedural-default question if the claim can be resolved easily against the habeas petitioner.  *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).  Having reviewed the pleadings and state-court record, the Court finds that Petitioner's claims do not warrant habeas relief.  The Court, therefore, excuses the alleged procedural errors and "cut[s] to the merits," because a procedural-default analysis would only complicate the case.  *Thomas v. Meko*, 915 F.3d 1071, 1074 (6th Cir.), *cert. denied*, 139 S. Ct. 2726 (2019).

## II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires prisoners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)).  The Supreme Court has explained that

> a state court decision is "contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor,* 529 U.S. 362, 405-406 (2000)) (alterations added).

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.,* at 413, 120 S.Ct. 1495. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id.,* at 410, 412, 120 S.Ct. 1495. The state court's application of clearly established law must be objectively unreasonable. *Id.,* at 409, 120 S.Ct. 1495.

*Id.* at 75.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt[.]' " *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal and end citations omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, "[o]nly an 'objectively unreasonable' mistake, . . . , one 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement,' slips through the needle's eye of § 2254." *Saulsberry v. Lee*, 937 F.3d 644, 648 (6th Cir.) (quoting *Richter*, 562 U.S. at 103), *cert. denied*, 140 S. Ct. 445 (2019).  "That's a 'high bar' to relief, which 'is intentionally difficult to meet.' " *Kendrick v. Parris,* __ F.3d __, __, No. 19-6226, 2021 WL 788431, at *7 (6th Cir. Mar. 2, 2021) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015)).

### III.  Analysis

#### A.  The Prosecutor

Petitioner alleges first that the prosecutor suppressed evidence that the police engaged in misconduct to induce Christian to testify falsely against him.  According to Petitioner, a police officer informed Christian that Petitioner had threatened to kill Christian and Christian's mother and grandmother and that, if Christian did not testify against Petitioner, Petitioner would be released and then kill Christian and his relatives. Petitioner contends that the prosecutor withheld this evidence and lied to the trial court when he stated that he became aware of Christian through Christian's phone calls from jail.

Petitioner also alleges that Christian perjured himself when he testified (i) that Petitioner made admissions about the crime while the two of them were living in the same house, and (ii) that Christian did not discuss the case with Petitioner while both of them were confined in jail.  Petitioner argues that Christian should not have been permitted to testify against him and that the tardy disclosure of Christian's jailhouse calls prevented him from proving that Christian's trial testimony was false.   (Am. Pet., ECF No. 20, PageID.1814-1815, 1818, 1857-68.)

The Michigan Court of Appeals adjudicated Petitioner's claim on direct review and ruled that Petitioner had not satisfied all the elements of a claim under *Brady v. Maryland,* 373 U.S. 83 (1963).  According to the Court of Appeals, Petitioner also failed to show that Christian perjured himself, that the allegedly false testimony affected the jury's verdict, and that the prosecutor's comment to the trial court about how he discovered Christian was inaccurate or untruthful.  *Sutton,* 2012 WL 3020386, at *5-*6.

11

Prosecutorial-misconduct claims are reviewed deferentially in a habeas case. *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).   Further, when "determining whether prosecutorial misconduct mandates habeas relief, [the Court applies] the harmless error standard." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (citing *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.1997)).   An error is "harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id*. (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 638, (1993)).

### 1. The Prosecutor's Alleged Suppression of Evidence

For the first part of his prosecutorial-misconduct claim, Petitioner relies on *Brady*, in which the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.   A true *Brady* claim has three components:   "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The Supreme Court has rejected any "distinction between impeachment evidence and exculpatory evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985).   "Such evidence is 'evidence favorable to an accused,' *Brady*, 373 U.S., at 87, 83 S. Ct., at 1196, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id*.

"Prejudice" in the *Brady* context occurs whenever the suppressed evidence is "material," *Thomas v. Westbrooks*, 849 F.3d 659, 663 (6th Cir. 2017), and

> evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In other words, favorable evidence is subject to constitutionally mandated disclosure when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)

*Cone v. Bell*, 556 U.S. 449, 469–70 (2009); *see also Gumm v. Mitchell*, 775 F.3d 345, 363 (6th Cir. 2014) ("Taken together, the materiality and prejudice prongs do not require a defendant to show that disclosure of the evidence would have ultimately led to an acquittal.  Instead, the defendant must establish only that in the absence of the evidence he did not receive a fair trial, 'understood as a trial resulting in a verdict worthy of confidence.' *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555.   If the undisclosed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict,' then a *Brady* violation has occurred.").

Here, even if Christian's phone calls from jail had impeachment value, the record does not support Petitioner's claim that the prosecutor suppressed audiotapes of the calls. Petitioner conceded in a written statement which he prepared for his sentencing that the prosecutor gave defense counsel a disk containing Christian's recorded phone calls after his trial began.  (5/26/10 Sentence Tr., ECF No. 23-18, PageID.2560.)  Petitioner also states in his habeas petition that the prosecutor provided defense counsel with audio disks during trial.  (Am. Pet., ECF No. 20, PageID.1866.)

*Brady* generally applies only to a complete failure to disclose exculpatory information, not delayed disclosure, *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.

13

1994), and "[d]elay violates *Brady* only where the delay causes prejudice." *United States v. Davis*, 306 F.3d 398, 420–21 (6th Cir. 2002). The delay in producing audiotapes of Christian's audiotapes did not prejudice Petitioner because he acquired the audiotapes before Christian testified. Defense counsel subsequently challenged Christian's testimony by asking him about his criminal record, his initial failure to report Petitioner's admissions to the police, and his favorable agreement with the prosecution. In the state court's words, "the audio recordings merely furnished an additional basis on which to impeach Christian, whose credibility was already shown to be questionable based on his prior convictions for felonies involving dishonesty and his deal with the prosecution[.]" *Sutton*, 2012 WL 3020386, at *5.

Furthermore, given the testimony provided by Murphy and Blessitt, evidence that Christian was induced to testify by death threats against him and his family would not have put the whole case in such a different light as to undermine confidence in the verdict. Petitioner's *Brady* claim, therefore, lacks merit. He has not shown that the prosecution suppressed evidence and that the evidence was material. The state appellate court's denial of Petitioner's claim was objectively reasonable.

### 2. The Prosecutor's Explanation for How He Found Christian

Petitioner contends that the prosecutor lied when he claimed that the audiotaped phone calls which he received from the jail led him to Christian. The record, however, does not support this contention.

At a pretrial hearing, the prosecutor explained to the trial court that he found out about Christian when he subpoenaed Petitioner's phone calls from jail and discovered Christian's outgoing calls mixed in with Petitioner's outgoing calls. (7/24/09 Mot. Hr'g Tr.,

14

ECF No. 23-7, PageID.2158.)  The prosecutor then provided defense counsel with a disk of all the phone calls that he had received when he subpoenaed Petitioner's phone calls, and he offered to obtain additional audiotapes for defense counsel.  *Id*. at PageID.2159-2160.

At trial, the prosecutor provided a similar explanation to the jury in his opening statement.  He said that he had requested a recording of Petitioner's jail calls, that those calls were mixed with Christian's calls, and that by listening to the calls, he learned that Christian had information about Dixon's murder.  The prosecutor went on to say that the officer in charge of the case subsequently went to the Wayne County Jail and took a statement from Christian.  (4/8/10 Trial Tr., ECF No. 27-5, PageID.4115.)   Later in the trial, the prosecutor provided defense counsel with six disks, which prompted defense counsel to seek an order allowing her to take a laptop to the jail and play the disks for Petitioner.  (4/8/10 Trial Tr., ECF No. 27-5, PageID.4229-4230.)

At no point did defense counsel question the authenticity of the prosecutor's claim that he learned about Christian through the audiotapes.  The officer in charge of the case, moreover, substantiated the prosecutor's version of the facts when the officer testified that he became aware of Christian after requesting some tapes from the Wayne County Jail.  (4/12/10 Trial Tr., ECF No. 23-13, PageID.2349.)

Nothing in the record suggests that the prosecutor deceived the trial court or the jury regarding the way he acquired information about Christian.  Even if the prosecutor did misstate the facts, the error could not have had a substantial and injurious effect on the jury's verdict, given the substantial evidence against Petitioner apart from Christian's

testimony.   The alleged misconduct, therefore, was harmless, and the state appellate court's rejection of Petitioner's claim was reasonable.

### 3.  The Alleged Perjury

Petitioner claims that Christian perjured himself, and he implies that the prosecutor suborned the perjury.  The Supreme Court has made clear that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' "  *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).   But "[t]o prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false."  *Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009); *see also Amos v. Renico*, 683 F.3d 720, 728 (6th Cir. 2012). Petitioner must demonstrate that the testimony in question was "indisputably false" and that the alleged perjury was not harmless error.  *Monea v. United States*, 914 F.3d 414, 421 (6th Cir. 2019).

Petitioner's perjury claim lacks merit because he has not shown that Christian's testimony was indisputably false.  Christian's testimony corroborated Murphy's testimony, and it does not appear that the two of them agreed to implicate Petitioner in the crime. Murphy went to the police and made a statement about Petitioner in October 2008. Christian independently divulged what he knew about the killing in mid-2009 when a police officer approached him in jail.  The officer, moreover, testified that he did not tell

Christian what to say or ask him leading questions.  (4/13/10 Trial Tr., ECF No. 23-14, PageID.2374-2375.)

Even if Christian perjured himself, Petitioner has not shown that the prosecutor knew the testimony was false or that Christian's testimony was material evidence. Christian provided very few details about Petitioner's admissions to him.  He was unable to provide the exact date when Petitioner told him about the crime, and he conceded that Petitioner had not named the victim during their conversation.  (4/12/10 Trial Tr., ECF No. 23-13, PageID.2311-2312.)   Furthermore, defense counsel was able to discredit Christian's testimony somewhat by eliciting information about Christian's prior convictions for receiving and concealing stolen property, two counts of unlawfully driving away an automobile, and retail fraud.  Christian also admitted that he had received a benefit for his testimony.  *Id*. at PageID.2304-2310.

Petitioner's perjury claim fails, and the state appellate court's rejection of the claim was objectively reasonable.  Petitioner, therefore, has no right to relief on his claim.

**B.  Trial Counsel**

Petitioner alleges next that his trial attorney provided constitutionally ineffective assistance by failing to notify the trial court that the prosecution used death threats to force Christian to testify falsely against him.  According to Petitioner, the death threats were mentioned in Christian's outgoing phone calls from jail.  Petitioner asserts that Christian would never have been permitted to testify if the trial court had known that Christian was biased and induced to testify against him by the death threats.  (Am. Pet., ECF No. 20, PageIID.1869-1875.)

The successor trial court addressed this issue on post-conviction review and concluded that the claim was procedurally barred by Petitioner's failure to raise the claim on appeal.  The court then stated that trial counsel was not ineffective and, therefore, Petitioner had failed to demonstrate prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), and "actual prejudice" under Michigan Court Rule 6.508(D)(3).[1]  (Order Denying Mot. for Relief from J., ECF No. 23-26, PageID.3617-3618.)

### 1.  Clearly Established Federal Law

The clearly established Supreme Court decision for Petitioner's claim is *Strickland*. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).  The Supreme Court stated in *Strickland* that "the proper standard for attorney performance is that of reasonably effective assistance." *Strickland*, 466 U.S. at 687.  To establish that counsel's assistance was so defective as to require reversal of a conviction, a convicted person must show that his

---

[1]  Rule 6.508(D)(3) states that,

> [t]he defendant has the burden of establishing entitlement to the relief requested.  The court may not grant relief to the defendant if the motion
>
> . . . .
>
>  (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates
>
> > (a) good cause for failure to raise such grounds on appeal or in the prior motion, and
> >
> > (b) actual prejudice from the alleged irregularities that support the claim for relief.

Mich. Ct. R. 6.508(D)(3).

attorney's performance was deficient and that the deficient performance prejudiced the defense. *Id*. Unless the convicted individual "makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*.

An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. Because of the difficulties inherent in evaluating an attorney's performance,

> a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. (internal citation omitted).

An attorney's performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S. at 693).

### 2.  Application

Petitioner asserts that defense counsel should have informed the trial court about Christian's audiotaped phone calls from jail to show that Christian was induced to testify by death threats against himself and his family.  Petitioner, however, has not presented the Court with an official transcript of the audiotapes, and his handwritten transcription of one phone call indicates that it was Petitioner who made the death threats.  (Am. Pet., ECF No. 20, PageID.1864.)  Additionally, Christian indicated at trial that his willingness to cooperate with the police was induced, at least in part, by the hope of getting some help with his own criminal case.   (4/12/10 Trial Tr., ECF No. 23-13, PageID.2307-2308.)

The state trial court, moreover, opined that evidence of the threats would have gone to the weight of Christian's testimony, not its admissibility.  The state court's interpretation of state law binds this Court on habeas corpus review. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  And because the state court determined that the alleged death threats would not have affected the admissibility of Christian's testimony, Petitioner was not prejudiced by defense counsel's failure to inform the trial court about the audiotapes and the alleged threats mentioned in the tapes.

To her credit, defense counsel undermined Christian's testimony in other ways.  She asked Christian about his prior convictions involving theft or dishonesty, (4/12/10 Trial Tr., ECF No., 23-13, PageID.2304-2307), the favorable agreement that Christian negotiated with the prosecution, *id*. at PageID.2308-2310, and his failure to notify the police about Petitioner when Petitioner first admitted to killing someone, *id*. at PageID.2313.

Defense counsel's trial strategy was reasonable.  Her failure to notify the trial court of alleged death threats against Christian did not amount to deficient performance, and the allegedly deficient performance did not prejudice the defense.  Therefore, the state courts' rejection of Petitioner's claim was not contrary to, or an unreasonable application of, *Strickland*, and Petitioner is not entitled to relief on his claim.

### C.  Trial Counsel's Failure to Call an Expert Witness

Petitioner alleges that he was prejudiced by his trial attorney's failure to call expert witnesses to testify about Murphy's psychiatric records.  Petitioner asserts that counsel's error may have affected the outcome of the trial.  (Am. Pet., ECF No. 20, PageID.1876-1886.)  The successor trial court addressed this claim on post-conviction review and rejected the claim because Petitioner failed to raise the claim on direct appeal.  The court concluded that because trial counsel was not ineffective, Petitioner had not demonstrated prejudice under Michigan Court Rule 6.508(D)(3).  (Order on Mot. for Relief from J., ECF No. 23-26, PageID.3619-3620.)

#### 1.  Legal Framework

The Court presumes that trial counsel's conduct fell "within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  *Bell v. Cone*, 535 U.S. 685, 702 (2002) (citing *Strickland*, 466 U.S. at 689).  "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.' "  *Pinholster*, 563 U.S. at 196 (quoting *Strickland*, 466 U.S. at 689-90); *see also Cathron v. Jones*, 77 F. App'x 835, 841 (6th Cir. 2003) (stating that, "[u]nder *Strickland* , we must presume that

decisions of what evidence to present and whether to call or question witnesses are matters of trial strategy") (citing *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002)).

Although "[i]t can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts," "[t]here are . . . 'countless ways to provide effective assistance in any given case.' " *Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689). "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id*. (quoting *Strickland*, 466 U.S. at 689).

### 2. Application

Defense counsel's failure to produce expert witnesses could have been a strategic decision, because she stated on the first day of trial that the prosecutor had provided her with Murphy's psychiatric records that morning and that she did not have time to read all the records. She indicated that she would read the names of potential witnesses during jury selection, but that she would not necessarily produce the individuals as witnesses. (4/5/10 Trial Tr., ECF No. 27-1, PageID.3902.)

During jury selection, defense counsel read a long list of medical professionals, including social workers and doctors, that she might call as witnesses. *Id*. at 3911-3912. Although she did not call any of those individuals as witnesses, Murphy's psychiatric records were admitted in evidence by stipulation of the parties. (4/13/10 Trial Tr., ECF No. 23-14, PageID.2386-2387.)

In addition, defense counsel elicited Murphy's testimony that Murphy had been diagnosed as bipolar and schizophrenic, that she suffered from paranoia, and that she had memory problems. Murphy also testified on cross-examination by defense counsel

that there were gaps in her treatment during the time in question, and during the gaps, she would self-medicate with alcohol, marijuana, and cocaine.  She also admitted that one treatment center had terminated its services due to her non-compliance with the recommended treatment.  (4/8/10 Trial Tr., ECF No. 27-5, PageID.4263-70.)

Petitioner also testified about Murphy's mental problems, (4/13/10 Trial Tr., ECF No. 23-14, PageID.2404-2405, 2409), and defense counsel raised the issue in her closing argument.  Counsel stated that Murphy was not consistent with her treatment and that she admitted to hearing voices, being paranoid, and having memory problems.  Defense counsel also stated that Murphy was delusional, that she was taking several "heavy duty" psychotropic medications, and that she self-medicated with other substances when she was not taking her medication.  Defense counsel argued that the things Murphy claimed to hear were not what she really heard, and that Murphy was not credible, in part, because of her mental problems.  (4/14/10 Trial Tr., ECF No. 23-15, PageID.2501-2505.)

"[T]he failure to seek an expert does not satisfy the performance prong of *Strickland* where counsel chooses a strategy that does not require an expert." *Swaby v. New York*, 613 F. App'x 48, 50 (2d Cir. 2015) (quoted with approval in *Kendrick*, 2021 WL 788431, at *11).  In this case, an expert witness was unnecessary because defense counsel adequately challenged Murphy's testimony in other ways.  Defense counsel "was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107.  Further, the state court's conclusion -- that trial counsel was not ineffective -- was objectively reasonable.  Petitioner, therefore, has no right to relief on his claim.

### D. Appellate Counsel

In his fourth and final claim, Petitioner alleges that his appellate attorney was constitutionally ineffective because the attorney omitted substantial issues on direct appeal. (Am. Pet., ECF No. 20, PageID.1887-1896.) The successor trial court addressed this claim during the post-conviction proceedings and stated that Petitioner had failed to demonstrate how appellate counsel's performance prejudiced him. (Order Denying the Mot. for Relief from J., ECF No. 23-26, PageID.3620-3623.)

The proper standard for evaluating a claim about appellate counsel is the standard enunciated in *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). To prevail on his claim, Petitioner must demonstrate (1) that appellate counsel acted unreasonably in failing to discover and raise non-frivolous issues on appeal, and (2) there is a reasonable probability that he would have prevailed on appeal if his attorney had raised all his claims. *Id*. (citing *Strickland,* 466 U.S. at 687-91, 694); *see also Pollini v. Robey,* 981 F.3d 486, 493 (6th Cir. 2020) (stating that, "to prevail on a *Strickland*-based ineffective assistance of appellate counsel claim, [the petitioner] must satisfy two prongs: (1) that his appellate counsel was deficient, and (2) that the deficiency prejudiced him").

An appellate attorney is not required to raise every non-frivolous claim requested by his or her client if the attorney decides, as a matter of professional judgment, not to raise the claim. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). In fact,

> the process of " 'winnowing out weaker arguments on appeal' " is "the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting *Barnes*, 463 U.S. at 751-52, 103 S.Ct. 3308). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).

*Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

Petitioner raised his prosecutorial-misconduct claim in his *pro se* supplemental brief on direct appeal. Therefore, he was not prejudiced by appellate counsel's failure to raise that issue. Petitioner's claims about his trial attorney lack merit because he has failed to show that he was prejudiced by his trial attorney's failure to produce expert witnesses or notify the trial court that Christian supposedly was induced to testify by death threats.

"[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). Further, the successor trial court's conclusion -- that appellate counsel was not ineffective -- is not contrary to, or an unreasonable application of, *Strickland.* Petitioner, therefore, has no right to relief on his claim about appellate counsel.

## IV. Conclusion

Petitioner's claims lack substantive merit, and the state courts' rejection of his claims was not objectively unreasonable or so lacking in justification that there was an error beyond any possibility for fairminded disagreement. Accordingly, the Court denies the amended petition for a writ of habeas corpus.

The Court declines to issue a certificate of appealability because reasonable jurists could not disagree with the Court's resolution of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The Court, nevertheless, grants Petitioner permission to proceed *in forma pauperis* on appeal if he appeals this decision because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).

IT IS SO ORDERED.


Dated: March 23, 2021                    s/Sean F. Cox_____
                                         Sean F. Cox
                                         U. S. District Judge